# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 08-2485/2594

_____

Donna Humphries,           *
          *
          Appellant/           *
          Cross-Appellee,           *
          *    Appeals from the United States
     v.           *    District Court for the Eastern
          *    District of Arkansas.
Pulaski County Special           *
School District,           *
          *
          Appellee/           *
          Cross-Appellant.           *

_____

Submitted: April 16, 2009
Filed: September 3, 2009

_____

Before WOLLMAN, MELLOY and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Donna Humphries brought this action against the Pulaski County Special School District ("District") alleging that the District breached its employment contract with her and that it unlawfully used race in its hiring practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981 and 1983, and the Arkansas Civil Rights Act. The district court granted the District's motion for summary judgment with respect to the federal claims and dismissed Humphries's state law claims without

prejudice. Both parties appeal, and for the reasons discussed below, we affirm in part and reverse in part.

## I.    BACKGROUND

Humphries, a white female with a doctorate degree in elementary education, has been employed with the District since 1984 and has worked as an elementary school counselor since 1989. Since 2001, Humphries has applied for virtually every elementary school assistant principal position that has been available in the District, including two such openings in August 2005. In 2007, Humphries also applied for a director of counseling services position with the District. In each instance, Humphries asserts that the District preferentially hired black applicants.

In August 2005, Humphries filed a claim with the Equal Employment Opportunity Commission ("EEOC"), alleging that the District repeatedly denied her an assistant principal position based on her race. After receiving a notice from the EEOC regarding her right to sue, Humphries filed suit in the district court on May 24, 2006, contending that the District discriminated against her based on her race when it failed to promote her to the assistant principal positions and that the District breached its contract with her by failing to give priority consideration to current employees when filling the assistant principal positions.[1] Humphries filed an amended complaint on September 26, 2007, which added the allegation that she was denied the director of counseling services position because of her race.

Both parties filed motions for summary judgment. In her motion for summary judgment, Humphries contended that direct evidence supported her discrimination

[1]Humphries initially claimed that the District also discriminated against her based on her age. The district court subsequently granted Humphries's motion to dismiss her age discrimination claims.

claims, including the District's policy of using biracial interview committees, the District's announced preference to "employ and advance blacks," the District's published racial quotas and goals for hiring black administrators, the District's practice of hiring assistant principals such that at least one assistant principal is of a different race than that school's principal, and statistical evidence establishing that the District favors black applicants in its hiring of administrative personnel.

In its motion for summary judgment, the District argued that its policies for employment and promotion were promulgated in response to court orders requiring the District to desegregate and implement procedures that would make the District attractive to minority students, teachers, and administrators. The District has a lengthy history of involvement in desegregation litigation. *See Little Rock Sch. Dist. v. N. Little Rock Sch. Dist.*, 451 F.3d 528, 529 (8th Cir. 2006) (summarizing the District's history of involvement in federal desegregation litigation). In 1982, the Little Rock School District sued the District, the North Little Rock School District, the State of Arkansas, and the Arkansas State Board of Education, seeking consolidation of the three Pulaski County school districts as a remedy for allegedly unconstitutional efforts to maintain racially segregated schools. *See Little Rock Sch. Dist. v. Pulaski County Spec. Sch. Dist. No. 1*, 778 F.2d 404, 408-09 (8th Cir. 1985) (en banc). This court affirmed the district court's finding that the District acted to perpetuate segregation by, among other things, failing to meet staff hiring goals. *Id.* at 427-28. In response to our decision, the District negotiated a settlement agreement with the other school districts, which we eventually ordered the district court to approve. *See Little Rock Sch. Dist. v. Pulaski County Spec. Sch. Dist. No. 1*, 921 F.2d 1371, 1388 (8th Cir. 1990). We also ordered the creation of the Office of Desegregation Monitoring ("ODM") to assist the district court in its supervision of the school districts. *See id.* The District operated under that settlement agreement until March 2000, when the district court approved a new plan submitted by the District called "Plan 2000." *Little Rock Sch. Dist. v. Pulaski County Spec. Sch. Dist. No.1*, Case No. 4:82-cv-866, Doc. No. 3347, at 2 (E.D. Ark. Mar. 21, 2000).

Regarding staffing, Plan 2000 requires that the District "recruit applicants for each available administrative position . . . in a manner designed to communicate, broadly, its availability and to develop a racially diverse pool of applicants." It also requires the District to "allocate teachers and other professional staff in a manner which avoids the racial identification of schools." The District's assistant superintendent for desegregation has "the authority to direct that additional recruitment take place prior to the offering of the position to a particular applicant." Further, the District's compliance with Plan 2000 is subject to continuous monitoring by the ODM.[2]

The district court granted summary judgment to the District, holding that Humphries failed to set forth direct evidence of unlawful discrimination because she "presented no evidence that the 'affirmative action' plan played any part in the District's decisions not to promote her." The court further held that even if Humphries could establish that the District followed its affirmative action plan in failing to promote her, Humphries could not establish that its plan was invalid. The court also dismissed Humphries's state law claims without prejudice. Humphries appeals the district court's grant of summary judgment to the District and denial of her motion for summary judgment. The District cross-appeals the district court's dismissal of Humphries's state law claims without prejudice.

## II.    DISCUSSION

"We review a district court's decision on cross-motions for summary judgment de novo." *Thirty and 141, L.P. v. Lowe's Home Ctrs., Inc.*, 565 F.3d 443, 445-46 (8th Cir. 2009). "Summary judgment is appropriate when, viewing the facts in the light

---

[2]In May 2003, the ODM found that the District "lacked a consistent guideline that defined what constituted a diverse pool of applicants." In December 2006, the ODM found that the District still had no guideline for what constituted a diverse pool of applicants.

most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* at 446. "A genuine issue of material fact exists if a reasonable jury could return a verdict for the party opposing the motion." *Chao v. Barbeque Ventures, LLC*, 547 F.3d 938, 941 (8th Cir. 2008).[3]

Humphries's claims may survive the District's motion for summary judgment in one of two ways. First, Humphries "may present admissible evidence directly indicating unlawful discrimination, that is, evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *See Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 863 (8th Cir. 2008). In the alternative, Humphries may present evidence "creating an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)." *See Fields*, 520 F.3d at 863-64 (parallel citations omitted).

Under the *McDonnell Douglas* framework, Humphries can establish a prima facie case of discrimination by showing: "(1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) that similarly situated employees outside the protected class were treated differently." *See id.* at 864. If Humphries meets her burden to establish a prima facie case of discrimination, the burden then shifts to the District "to establish a legitimate, nondiscriminatory reason for taking the allegedly discriminatory action." *See Hammer v. Ashcroft*, 383 F.3d 722, 724 (8th Cir. 2004). If the District puts forth such a reason, Humphries must then show that the District's proffered explanation is pretextual or her claims will fail. *See id.*

---

[3]Because Humphries's Title VII and §§ 1981 and 1983 claims "'set forth parallel, substantially identical, legal theories of recovery,' we apply the same analysis to" each claim. *See Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 863 n.3 (8th Cir. 2008) (quoting *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir. 1997)).

## A. Assistant Principal Positions

Humphries first contends that the district court erred by finding that she presented no direct evidence of unlawful discrimination. In particular, she points to evidence of the District's affirmative action policies. The District does not dispute that it has affirmative action policies. For example, the District does not dispute that its policy is to use biracial committees to conduct interviews when filling above-entry-level positions, and it concedes that it used biracial committees to select the candidates for the assistant principal positions sought by Humphries. The District also does not deny that its job postings for the two assistant principal positions announced in August 2005 included the following language: THE DISTRICT WILL MAKE SPECIAL EFFORTS TO EMPLOY AND ADVANCE WOMEN, BLACKS, AND HANDICAPPED PERSONS. Further, the District's published hiring goals include having at least one minority administrator at each elementary school and "attain[ing] a ratio of black administrators in the [District] in proportion to the ratio of black certified personnel in the [D]istrict in the preceding year." Members of the biracial interview committees are trained to abide by the District's "racial equality" policies.

The District does, however, dispute Humphries's assertion that it has a policy of hiring assistant principals such that at least one assistant principal at each school is of a different race than that school's principal. Humphries contends that she presented sufficient evidence to create a question of fact about whether the district has such a policy. She points to evidence that from October 2002 to August 2005, black applicants were hired for twelve out of fourteen assistant principal openings and, in eleven of those instances, the principal at the school was white. In the twelfth instance, the school's principal was black, but the school already had one white assistant principal. The two white assistant principals were hired at schools where the principals were black. Humphries's expert concluded that a statistical analysis of this evidence showed that the District has a policy of biracially pairing principals and assistant principals because black applicants were selected at schools with white

principals in excess of 5.64 standard deviations above what would have been expected in the absence of such a policy, based on the relevant labor market. *Cf. Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 309 n.14 (1977) (suggesting that standard deviations between 2 and 3 constitute acceptable statistical proof of discrimination).

The District argues that Humphries's statistical evidence is unreliable, challenging several aspects of her analysis, particularly whether Humphries's expert used the appropriate applicant pool. Humphries's expert used the number of certified teachers in the District as the comparative applicant pool. The District's expert used the number of applicants for each job as the comparative pool and concluded that the statistical evidence did not support the proposition that the District had such a policy. As the Supreme Court has noted, when a job requires special qualifications, "comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." *Id.* at 308 n.13. Humphries argues that all certified teachers possess the necsesary qualifications for an assistant principal job, while the District asserts that only certain teachers possess the necessary administrative certification. The parties' different methods of analysis create an issue of fact, and the "determination of the appropriate comparative figures in this case will depend upon further evaluation by the trial court." *See id.* at 312 ("Statistics come in infinite variety. Their usefulness depends on all of the surrounding facts and circumstances. Only the trial court is in a position to make the appropriate determination after further findings." (internal citation and alterations omitted)). The district court made no findings regarding Humphries's statistical evidence. It did not, for example, conclude that Humphries's expert's analysis was flawed because the analysis failed to control for relevant variables. *Cf. El Deeb v. Univ. of Minn.*, 60 F.3d 423, 430-31 (8th Cir. 1995) (affirming the district court's grant of summary judgment where the district court found that the plaintiff's statistical analysis was insufficient as a matter of law because it failed to control for relevant variables). We cannot say as a matter of law whether one analysis is superior to the other. Viewing the facts in the light most favorable to Humphries, a reasonable jury

could conclude that the District has a policy of pairing assistant principals with principals of different races.

The District next argues that each of its affirmative action policies was properly promulgated in response to various court orders requiring the District to implement procedures to desegregate and make itself attractive to minority administrators. While this court has not addressed the issue of whether reliance on a court-sanctioned affirmative action plan may be direct evidence of discrimination, several of our sister circuits have suggested that an affirmative action plan may be direct evidence of discrimination if the challenged employment action resulted from the employer acting in connection with that plan. *See Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003) (also requiring a showing that the plan is invalid); *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1110 (11th Cir. 2001) (same); *McGarry v. Bd. of County Comm'rs*, 175 F.3d 1193, 1200 (10th Cir. 1999); *Brown v. McLean*, 159 F.3d 898, 904 (4th Cir. 1998); *Ceratto v. S.F. Cmty. Coll. Dist.*, 26 F.3d 968, 976 (9th Cir. 1994).

We now join our sister circuits in concluding that evidence that an employer followed an affirmative action plan in taking a challenged adverse employment action may constitute direct evidence of unlawful discrimination. If the employer defends by asserting that it acted pursuant to a valid affirmative action plan, the question then becomes whether the affirmative action plan is valid under Title VII and the Equal Protection Clause. *See Bass*, 256 F.3d at 1113, *cf. Ricci v. Destefano*, 557 U.S. ---, 129 S. Ct. 2658, 2673 (2009) (holding that a city's making promotion decisions based on race would violate Title VII without a "valid defense"); *Donaghy v. City of Omaha*, 933 F.2d 1448, 1458 (8th Cir. 1991) (holding that satisfaction of the four-part *McDonnell Douglas* test will not necessarily show a prima facie violation of § 1983 in a reverse discrimination case where the employer was acting pursuant to a "bona fide affirmative action plan," but not discussing whether evidence of an employer's acting pursuant to the affirmative action plan would constitute direct evidence of unlawful discrimination).

Because the District does not dispute the existence of several of its affirmative action policies, Humphries must next show that the District acted pursuant to those policies in failing to promote her to the assistant principal positions. *See Fields*, 520 F.3d at 863 (requiring a "specific link between the alleged discriminatory animus and the challenged decision"). We conclude that Humphries has raised a genuine issue of material fact concerning whether there was a specific link between the District's decision not to promote her and the District's various affirmative action policies. Humphries presented evidence that the District's interview committees are instructed to abide by the District's affirmative action policies. The District's published hiring goals include hiring at least one minority administrator at each school and attaining a ratio of black administrators in proportion to the number of black certified personnel in the District. And, as explained above, Humphries created a genuine issue of material fact concerning whether the District has a policy of hiring assistant principals who are of a different race than the principal at a particular school. A reasonable jury could conclude that interviewers, who had been trained in the District's "racial equality" policies, effectuated those policies through their scoring and ranking of applicants and that the District therefore acted pursuant to its affirmative action policies when it failed to promote Humphries to one of the assistant principal positions. *See Bass*, 256 F.3d at 1112-13; *Frank,* 347 F.3d at 137 (finding direct evidence of unlawful discrimination where the employer explicitly identified racial goals and managers were evaluated on how well they complied with the affirmative action policy's objectives).

The District argues that Humphries cannot show that she was adversely affected by its affirmative action policies because her low scores during her initial interviews precluded her from reaching the final stage of interviewing. The District relies on *Donaghy*, in which we held that the plaintiff, a white male, did not have standing to challenge his employer's decision to interview and promote a black applicant because the plaintiff's scores on a multiple choice test left him ranked below several other applicants. *Donaghy*, 933 F.2d at 1454-55. However, there was no allegation in

*Donaghy* that the multiple choice test was biased against whites or subjective in any other way. By contrast, Humphries asserts that the District's interviewers were influenced by the District's affirmative action policies and that their rankings were therefore biased by their desire to comply with those policies. Thus, *Donaghy* does not support the District's position. As explained above, Humphries has met her burden of raising a genuine issue of material fact about whether there was a specific link between the District's failure to promote her and the District's affirmative action policies.

Finally, to defeat summary judgment, Humphries must show that the District's affirmative action policies are invalid. *See Bass*, 256 F.3d at 1113; *cf. Johnson v. Transp. Agency*, 480 U.S. 616, 626-27 (1987) (explaining that the burden is on the Title VII plaintiff to show that an affirmative action policy is invalid). An affirmative action policy is valid if the policy is remedial and narrowly tailored to meet the goal of remedying the effects of past discrimination. *Donaghy*, 933 F.2d at 1458. A policy may be considered remedial if the employer has identified a "manifest imbalance" in the work force. *Maitland v. Univ. of Minn.*, 155 F.3d 1013, 1016 (8th Cir. 1998) (quoting *Johnson*, 480 U.S. at 631). A policy may be shown to be remedial through evidence that it was implemented "in adherence to a court order, whether entered by consent or after litigation." *Donaghy*, 933 F.2d at 1459; *see also Maitland*, 155 F.3d at 1017. But a policy may not "unnecessarily trammel" the rights of non-minorities, and it must be "intended to attain a balance, not to maintain one." *Maitland*, 155 F.3d at 1016 (internal quotation and alteration omitted).

The District contends that its policies are consistent with Plan 2000 and with previous court orders, as well as with mandates from the ODM in response to its findings concerning the District's implementation of Plan 2000. Although the district court found that the District's policies were valid, it did not discuss the basis for that finding. The court merely noted that "[w]hile Humphries argues that the District is no longer subject to monitoring as to its administrative staffing and has met or perhaps

-10-

exceeded its goals, the Court is not prepared to say that the District's plan is invalid and that the District is no longer subject to an agreement approved by the court in the Little Rock School Desegregation Case." If the District's affirmative action policies were implemented pursuant to court orders, that would "not guarantee that the [policies] serve a remedial purpose," but "the heightened judicial oversight inherent in a properly entered [court order]" would support the District's argument that its polices are remedial. *See id.* at 1016-17 (internal quotations and citations omitted). However, at oral argument the District could not identify with specificity which court orders, besides Plan 2000, that it was bound by or whether the ODM had required it to implement other policies in response to the ODM's monitoring. Without this information, we cannot determine whether the District's affirmative action policies are consistent with court orders or ODM mandates.

Moreover, the District's assertion that its policies were implemented in adherence to Plan 2000 does not support its argument that its polices are remedial. Many of the District's policies seem to be aimed at increasing the number of minority administrators hired. However, Plan 2000 merely requires the District to attain a racially diverse applicant pool for administrative positions; it does not set hiring goals. As the District conceded at oral argument, there is nothing in Plan 2000 related to biracial interview committees or hiring quotas for particular positions. Additionally, Humphries showed that there is an issue of fact regarding whether the District has a policy of pairing assistant principals with principals of different races. If such a policy exists, it is not a part of Plan 2000. Thus, the District cannot rely on Plan 2000 to show that its policies were remedial.

We turn, then, to the question whether the District's policies were remedial because they addressed a manifest racial imbalance in the District's work force. *See Maitland*, 155 F.3d at 1016. We conclude that there are genuine issues of material fact related to the questions whether the District's affirmative action policies addressed a manifest racial imbalance in the workforce and, relatedly, whether the

policies were aimed at attaining a balance in the workforce. *See id.* at 1018 (reversing a grant of summary judgment to an employer because the plaintiff "demonstrated that there is a genuine issue of material fact on the question of whether there was a manifest . . . imbalance in faculty salaries based on gender"). The parties did not focus on this issue in their briefs on appeal or in the district court, though Humphries did present evidence that the District's annual reports claim that the District "continues to meet" its racial quotas for administrators. Humphries contends, and we agree, that this evidence creates a genuine issue of material fact about whether there was a manifest imbalance in the workforce and whether the District is impermissibly maintaining, rather than attaining, a racial balance. *See id.* Because there are genuine questions of material fact remaining, we are unable to determine whether the District's affirmative action policies are valid as a matter of law. *See id.*

Accordingly, we find that Humphries has presented sufficient direct evidence of unlawful race discrimination by showing that there are genuine issues of material fact regarding the District's affirmative action policies, regarding whether the District acted pursuant to those policies when it failed to promote her to the assistant principal positions, and regarding whether the District's affirmative action policies are valid. We therefore reverse the district court's grant of the District's motion for summary judgment with regard to Humphries's claims that the District discriminated against her when it refused to promote her to the assistant principal positions.[4]

## B. Director of Counseling Services Position

Humphries failed to file a complaint of unlawful discrimination with the EEOC with respect to the District's failure to promote her to the director of counseling services position. "Although an EEOC complaint need not specifically articulate the

---

[4]Because there are genuine issues of material fact concerning Humphries's claims, the district court did not err in denying Humphries's motion for summary judgment.

precise claim, it must nevertheless be sufficient to give the employer notice of the subject matter of the charge and identify generally the basis for a claim." *Fair v. Norris*, 480 F.3d 865, 867 n.2 (8th Cir. 2007) (internal quotation omitted). Thus, we agree with the district court that summary judgment is appropriate because Humphries failed to exhaust her administrative remedies on her claim that the District's failure to promote her to the director of counseling services position was racially discriminatory. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (explaining that discrete acts such as failure to hire are "easy to identify," and noting that "[e]ach incident of [alleged] discrimination . . . constitutes a separate actionable 'unlawful employment practice'").

## III.   CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment to the District with respect to Humphries's assistant principal claims, affirm the grant of summary judgment on her director of counseling claim, and remand for proceedings consistent with this opinion. We also reinstate Humphries's state law claims so that the district court may reconsider whether to hear the state law claims along with the federal claims. *See Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 763 (8th Cir. 1998).

MELLOY, Circuit Judge, concurring in part.

While I agree with the majority's opinion in large part, I write separately to emphasize that compliance with a valid remedial consent decree is a complete defense to claims for individualized relief. See Martinez v. City of St. Louis, 539 F.3d 857, 861 (8th Cir. 2008). On remand, the district court's inquiry should focus on whether the policies now at issue were implemented pursuant to the consent decree.

This is not the first time we have considered a discrimination claim in the context of a consent decree, and not all consent decrees play the same role in any ensuing litigation. In Maitland v. University of Minnesota, a male university faculty member brought a gender-based discrimination claim against a university, challenging the university's affirmative action salary plan. 155 F.3d 1015 (8th Cir. 1998). In that case, we repeated our holding in Donaghy v. City of Omaha, 933 F.2d 1448, 1459 (8th Cir. 1991), that "the employer's required showing in defense of its plan remains the same notwithstanding the court's sanction." Maitland, 155 F.3d at 1016. Importantly, however, we noted in Maitland that the affirmative action plan could not "be said to have been imposed after making a formal finding of intentional discrimination." Id. (internal quotation omitted). In discounting the relevance of the consent decree, we noted that the court issuing the decree "frankly acknowledge[d] there [was] an open question as to whether discrimination even exist[ed]." Id. at 1018. Similarly, in Donaghy, we distinguished the consent decree there at issue from "a remedial plan that a court has imposed after making a formal finding of intentional discrimination." 933 F.2d at 1459. While it remains true that an affirmative action policy implemented pursuant to a court-approved compromise may not always "guarantee that the policies serve a remedial purpose," ante, at *11 (alteration omitted), the same cannot be said of all policies or all consent decrees.

In contrast to Maitland and Donaghy, and notwithstanding Humphries's assertions to the contrary, the historically pervasive discrimination in the District has been subject to decades of litigation, and desegregation of administrative staff has long been considered integral to the broader desegregation goals. See, e.g., Little Rock Sch. Dist. v. N. Little Rock Sch. Dist., 451 F.3d 528, 529 (8th Cir. 2006); Little Rock Sch. Dist. v. Pulaski County Spec. Sch. Dist. No. 1, 778 F.2d 404 (8th Cir. 1985) (en banc). As such, Maitland and Donaghy are limited in their present application. Here, unless the remedial consent decree was invalid when entered into, compliance with the decree "is a complete defense to . . . claims for damages and other individualized relief" until such time as the decree is modified or dissolved. Martinez,

-14-

539 F.3d at 861. Here, the validity of the consent decree when entered into remains unchallenged, and the consent decree had not been dissolved at the time of the alleged discrimination (and has not been dissolved to date). Thus, the primary question is not whether the affirmative action policies were independently remedial nor whether there was a manifest imbalance in assistant principal positions but whether the affirmative action policies were implemented pursuant to the remedial consent decree.

The majority correctly explains that Humphries has raised a triable question as to whether the District's affirmative action policies were linked to its decision not to promote her but that she must also show that the relevant policies are invalid. Ante, at *10. In light of the existing remedial consent decree, however, the initial focus of the validity analysis must be whether the affirmative action policies at issue fall within the scope of that decree. The express terms of Plan 2000 provide the starting point of this analysis, but they do not provide the ending point, for, as the majority notes, Plan 2000 is subject to ongoing monitoring by the ODM. Ante, at *4. While the consent decree "cannot be used to justify actions *aside from those mandated by its own terms*," Martinez, 539 F.3d at 861 (quotation omitted), I disagree with the majority's conclusion that other court orders or ODM mandates would not afford the District the same defense as that which would be provided if found in the express terms of Plan 2000. See ante, at *11. Accordingly, in determining whether the District's affirmative action plans are valid, on remand the district court should first consider whether the policies were implemented pursuant to the consent decree then in place, whether through the express language of Plan 2000 or otherwise.

_____