Craig CLAY, Plaintiff,

v.

LAFARGE NORTH AMERICA, Lafarge North American Davenport Plant, Michael Fisher, Jerry Miller, David Schnell, and Joseph Pennings, Defendants.

No. 3:11–cv–00047–JEG.

United States District Court,
S.D. Iowa,
Davenport Division.

Feb. 13, 2013.

Dorothy A. O'Brien, Dorothy A. O'Brien, Attorney & Counselor Law, PLC, Patricia E. Zamora, Zamora Taylor Woods & Frederick, Davenport, IA, for Plaintiff.

Martha L. Shaff, Betty Neuman & McMahon PLC, Davenport, IA, Robert P. Lombardi, Samuel Zurik, III, The Kullman Firm, New Orleans, LA, Defendants.

## ORDER

JAMES E. GRITZNER, Chief Judge.

Now before the Court are Motions for Summary Judgment and a Motion to Strike brought by Lafarge North America (Lafarge), Lafarge North American Davenport Plant (the Davenport Plant), Michael Fisher (Fisher), Jerry Miller (Miller), David Schnell (Schnell), and Joseph

Pennings (Pennings) (collectively, Defendants). Plaintiff Craig Clay (Clay) resists. The Court held a hearing on the motions on January 4, 2013. The matter is fully submitted and ready for disposition.

## I. PROCEDURAL AND FACTUAL [1] HISTORY

Lafarge is a Maryland corporation with its principal place of business in Virginia. Clay, a sixty-year-old African American and citizen of Iowa, worked for Lafarge at the Davenport Plant in Buffalo, Iowa, from 1991 to September of 2010. When Clay started with Lafarge, there were approximately fifteen minority employees at the Davenport Plant including approximately twelve African Americans. Clay started as a laborer doing shift work in the production department. Approximately six months into his employment, Clay was moved into a production assistant position and also worked in the control room. Clay contends that he enjoyed his job, worked hard, and was well-regarded by his coworkers and supervisors.

During the course of Clay's employment, however, Clay encountered, amongst other things, a number of racially offensive comments. In the 1990s, Joe Scott (Scott), Clay's supervisor at the time, told Clay to get his black ass moving. After Clay complained about the incident, his foreman responded by calling a meeting and instructing Scott to treat Clay with respect. Scott also once sent workers to instruct Clay to "go to the back end of the kiln" to work while two replacements performed Clay's job; once receiving confirmation that this was Scott's instruction, Clay complied. Clay reported the incident to Ron

Thorsen, the production manager, who told Scott his conduct was not a good way to build team morale. During this same time period, while performing his work duties, Clay caught his finger in a door, but Scott refused to release Clay to seek medical attention. When his shift ended, Clay went to the hospital and learned he had broken his finger.

Approximately ten to eighteen years before Clay filed his complaint, Clay found a dead snake on his windshield, presumably left by a coworker. During this same time period, David Roe (Roe), a supervisor, referred to a piece of equipment as "nigger-headed." On one occasion, Roe also instructed Clay to "[g]et your black ass out there." In addition to this offensive language, Roe once assigned Clay to work by himself on top of a silo on the coldest day of the year, a task normally undertaken by two workers.

In 2005, Clay moved into the shipping department, a day shift job. Clay continued to work in the shipping department until his employment ended in September of 2010. Sometime in either 2007 or 2009, Clay suffered an injury to his ankle. Schnell, the shipping manager, instructed Clay to wait a few days before seeking medical treatment. Both Schnell and Clay believed Clay's ankle to be sprained—a common injury at the plant—thus, to accommodate Clay's injury, Schnell offered Clay light work duty. Clay accepted the assignment but later learned he had broken a bone in his ankle.

While Schnell worked as shipping manager, he had a practice of delegating tasks to Clay that a few others—specifically Les

---

1. The Court views the evidence either as undisputed, or in the light most favorable to the nonmoving party, and affords the nonmovant all reasonable inferences, *see, e.g., Lexicon, Inc. v. ACE Am. Ins. Co.*, 634 F.3d 423, 425 (8th Cir.2011) (citing *Contemporary Indus.*

*Corp. v. Frost*, 564 F.3d 981, 984 (8th Cir. 2009); Fed.R.Civ.P. 56(a)), unless the asserted facts are "blatantly contradicted by the record, so that no reasonable jury could believe [them]," *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

Drumm (Drumm) and Bob Firrell (Firrell)—refused to perform. In his agency filings, Clay indicated that Schnell made a practice of assigning overlapping shifts for truck scale operators, but he always assigned tasks to Clay when he was not otherwise engaged. Clay alleges this work was often more difficult and dirtier than what was assigned to other workers. Clay complained that this practice was unfair; Schnell explained it was easier for him to have his more compliant workers—like Clay—perform these tasks rather than listen to others—like Drumm—complain.

In approximately 2009, two of Clay's coworkers, Dennis Terrill (Terrill) and Mike Price (Price), referred to Clay as "the other white meat" on two or three occasions. When Clay asked that they stop, both Terrill and Price complied.

In the summer of 2009, Terrill and Clay gained access to the tool crib while working overtime on the weekend, as they needed cable clamps to make a repair to keep the plant running. The tool crib was unattended, thus Terrill and Clay used the foreman's keys to gain entry. Clay alleges that Price reported to Scott that Clay and Terrill had broken into the crib, and Scott insinuated they had been stealing. Clay further alleges that, though he was not formally written up, Price made several complaints and caused trouble for him. Defendants counter that Clay was thanked for his initiative, and neither Clay nor Terrill were reprimanded.

On two consecutive nights in November of 2009, production manager Miller[2] assigned Clay to clean up a spill in a basement with a vacuum truck. While on both nights Clay had a coworker that worked the kill switch, he had no one assigned to relieve him of the physically demanding and dangerous job of running the suction hose, despite the usual assignment of no less than two or three men to perform such a task. On both nights, Clay worked the hose for approximately two hours with no relief, while the morning shift had four white employees assigned to the truck.

In March of 2010, after reporting to work and attending a safety meeting, Clay was ordered by Schnell to get to work. Approximately fifteen minutes later, Clay returned to the office to find Schnell and some of his fellow coworkers—all white— still sitting in the office. They left to work upon Clay's arrival.

In the spring of 2010, Clay referred Gary West (West), a personal friend, for employment at Lafarge. West, who had been laid off from John Deere Corporation, was a highly-skilled technician applying for a laborer position. West went through the requisite testing procedures and was one of nine persons granted an interview. There were five open positions, all of which ultimately were awarded to white males, four of whom had familial connections at Lafarge. When Lafarge did not select West for the position, Clay, on May 10, 2012, complained to Fisher regarding the hiring decision, alleging nepotism in Lafarge's hiring practices. Clay contends that he similarly complained of discrimination and had previously indicated that he thought it was time another minority was hired. While the decision did not impact Clay's employment status or bid on jobs, Clay felt personally insulted by Lafarge's rejection of West. Fisher investigated West's non-selection. At the conclusion of his investigation, Fisher informed Clay that he had found no fault

---

**2.** In his affidavit, Clay alleges that Schnell assigned him this task; however, Clay reported in his agency materials that it was Miller, not Schnell, that gave him this assignment. Similarly, at his deposition testimony, Clay attributed the assignment to Miller.

with Lafarge's hiring practices.[3]

On May 19, 2010, Roger Hunt (Hunt), another Lafarge employee, approached Clay and said, "boy, I wanna talk to you." In response, Clay walked away. The following day, Hunt apologized to Clay for the incident. Clay refused the apology. A few days later, Stanley Young (Young), another Lafarge employee, entered Clay's work area, and Clay asked Young if Young could identify the type of ducks swimming in the river in front of them. Young responded that they were called "nigger ducks" and that they were "good for nothing"; Clay walked away.

On June 2, 2010, Clay complained to Fisher about the comments made by Hunt and Young. Fisher investigated Clay's complaints that same day, at which time Young and Hunt generally admitted making the offending statements. Following the investigation, Fisher informed Clay that Young would be fired and Hunt would be disciplined with three days off, neither of which ultimately transpired.

While Lafarge had decided to terminate Young, prior to being notified of this determination, Young submitted paperwork for retirement. Young, who never returned to the plant nor made another improper comment to Clay, was placed on a leave of absence until his retirement became effective.

At the close of Lafarge's investigation, Lafarge determined Hunt had used inappropriate language but that the evidence did not support a finding of racial animus as Hunt had apologized to Clay and otherwise used the term "boy" when addressing white employees—a finding based upon evidence provided by the union on Hunt's

behalf but contested by Clay. Thus, Hunt was issued a disciplinary warning putting him on notice that any further such conduct would result in termination. Thereafter, Hunt made no more inappropriate comments to Clay.

Shortly after reporting the comments made by Hunt and Young, Clay spoke to a white employee, Drumm, regarding his failing to say hello to Clay. While the parties dispute the tone and nature of the communication, they concede that following this conversation, Drumm complained to Fisher that he felt threatened by Clay. Fisher investigated Drumm's complaint, including interviewing Clay, at which time Clay denied any misconduct. Ultimately no discipline directly resulted from the complaint. Clay later learned that his entire department had been aware of Drumm's intention to file a complaint against him; this revelation was particularly hurtful to Clay.

In June of 2010, Eugene McWilliams retired, making Clay the only remaining African American employee at the Davenport Plant. At that time, the plant had approximately eighty-five hourly employees and twenty office staff and managers. Through the duration of Clay's time at the plant, no other African American was hired.

On July 30, 2010, Clay provided Lafarge a list of fourteen previously unreported offensive and primarily racially oriented comments that he had either witnessed or was made privy to during his eighteen years of employment with Lafarge. This list specified neither the time of the statement nor the persons alleged to have participated in the incident, although that information was later provided by Clay.[4]

---

3. Lafarge later contacted Clay requesting that Clay obtain West's permission to run a background check on West. Lafarge subsequently learned that West had returned to work for John Deere.

4. In addition to those previously mentioned, these comments include: 1–3 years before

After Clay's complaint to management in the spring and summer of 2010, Clay was shunned by some of his coworkers. Clay understood that the actions of his coworkers were motivated by their belief that Clay had gotten his coworkers fired so that African Americans could get hired. These behaviors deeply upset Clay, impaired his ability to sleep, caused him to cry, and left him exhausted during the workday.

In July and August of 2010, Clay committed a number of on-the-job safety violations that resulted in accidents. On July 5, 2010, Clay was driving a truck while eating and dropped his food. When bending down to pick up the food, Clay ran into a post and dented the bumper of the truck. That same month, on July 29, 2010, Clay was driving the same truck and hit the same post, further denting the truck and making the door difficult to open. Following this second accident, Clay was reassigned to the rail loading location where he was not required to drive a truck. In early August of 2010, Clay walked away from the rail loading operation to go to lunch and failed to close the valve that was feeding cement into the railcar, resulting in a major spill of tons of cement.

Other employees had been terminated by Lafarge for fewer safety violations; thus, Clay could have been terminated for these three safety incidents alone. Instead, Clay was interviewed about the incidents, at which time he attributed his errors to stress issues. Fisher consulted with other human resource managers in the company and was informed that in a similar instance another employee had been referred to the Employee Assistance Program (EAP) for evaluation. Fisher's manager instructed Fisher to refer Clay to the EAP, which Fisher did. The EAP psychologist recommended that Clay be placed on short-term leave, a suggestion adopted by Lafarge. When in the care of the EAP psychologist, Clay was diagnosed with and received medication for anxiety and depression.

In October of 2010, Clay was released to return to work. Instead of returning to work, Clay submitted retirement papers. Clay states he felt he had no other option but to retire and that he was afraid he might hurt himself or others. In conformity with Clay's request, Clay was given interim, bridge leave until his retirement took effect.

Following the end of his employment in 2010, Clay filed claims with the Iowa Civil Rights Commission (ICRC) and the Equal Employment Opportunity Commission (EEOC). On November 30, 2010, Clay received his Right to Sue Letter from the ICRC. This was followed by the EEOC Notice of Right to Sue that Clay received on February 4, 2011. Clay brought this action in the Iowa District Court for Scott County on March 1, 2011. Defendants removed the action on April 11, 2011.

---

July of 2010—Jason Mangles said, "Why would he put nigger wheels on that truck"; 5–10 years before July of 2010—Jeff Buchannan referred to multiracial children as "mutts," Bob Phillips said, "The only reason you're working here is because the government subsidizes your pay," Stanley Young said, "There are more [v]ets working here tha[n] niggers," Charlie Anderson, a supervisor, said outside of Clay's presence, "Martin Luther Coon Day, maybe we should kill another one and get another day off"; 10–18 years before July of 2010—Jeff Buchanan said, "Shift work is for niggers," and "That's too much money for niggers to make," Todd Peterson said, "Maybe we should start trapping little black babies in Somalia," John McPhillip said, "You look like a black monkey," and Dick Arndt said, "You don't have the brain power to do this job." Defs.' App. D071, ECF No. 32–3; Pl.'s Ex. 11/61, ECF No. 38–5; Clay Aff. ¶¶ 10(c), (f)-(h), (j)-(k), (m), (o)-(q), 11(r).

Clay filed an Amended Complaint on September 13, 2011, alleging discrimination under Title VII, discrimination under 42 U.S.C. § 1981, discrimination under the Iowa Civil Rights Act (ICRA), Iowa Code Chapter 216, and aiding and abetting charges against Fisher, Miller, Schnell, and Pennings (Individual Defendants). On August 8, 2012, Lafarge and the Individual Defendants separately filed Motions for Summary Judgment. In his response, Clay did not resist summary judgment with regard to the Davenport Plant, Fisher, Miller, and Pennings. Further, Clay did not resist summary judgment with regard to his ICRA claim and Title VII claim against Schnell. Subsequent to the filing of Clay's response, the Defendants collectively filed a Motion to Strike pursuant to Federal Rules of Civil Procedure 56(e) and 37, averring that Clay's affidavit, adjoined to Clay's response, is self-serving, contradicts prior testimony, was undisclosed during discovery, constitutes hearsay, and is otherwise conclusory and impermissible. Thus, remaining before the Court is the admissibility of Clay's affidavit, the discrimination claims brought against Lafarge, and the hostile work environment claim brought against Schnell.

## II. DISCUSSION

### A. Motion to Strike

Defendants request, pursuant to Federal Rules of Civil Procedure 56(e) and 37, that the Court strike the affidavit provided by Clay and attached to his resistance to the Motions to Dismiss for the above stated reasons. Defendants further request that portions of Firrell's affidavit be stricken as conclusory and lacking foundation and that Clay's Exhibits 5 and 6 be stricken for lack of foundation, for lack of authentication, and for Clay's failure to disclose them during discovery.

Rule 56(e) provides *inter alia* that when "a party fails to properly support an assertion of fact," it is within the Court's discretion to "grant summary judgment if the motion and supporting materials, including the facts considered undisputed, show that the movant is entitled to it" or "issue any other appropriate order." Under Rule 37, which governs orders compelling disclosures and discovery, "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed.R.Civ.P. 37(a)(4). When a party fails to obey a Court's discovery order, it is within the Court's discretion to strike the offending pleadings in whole or in part. Fed.R.Civ.P. 37(b)(2)(A)(iii).

District courts enjoy considerable discretion when ruling on a motion to strike. *See Nationwide Ins. Co. v. Cent. Mo. Electric Coop., Inc.,* 278 F.3d 742, 748 (8th Cir.2001). This Court need not exercise that discretion, however, as a motion to strike is not a proper vehicle to challenge affidavits and exhibits provided in support of a motion for summary judgment. Though the contested materials may well be outside the Court's purview for purposes of summary judgment, they do not constitute pleadings as accommodated by Rule 37. *See Mecklenburg Farm v. Anheuser–Busch, Inc.,* 250 F.R.D. 414, 420 n. 7 (E.D.Mo.2008) ("A motion to strike is properly directed only to material contained in pleadings.... Motions, briefs, memoranda, objections or affidavits may not be attacked by a motion to strike."); *see also* Fed.R.Civ.P. 7(a) (defining a pleading as including a complaint, an answer to a complaint, an answer to a counterclaim designated as a counterclaim, an answer to a crossclaim, a third-party complaint, an answer to a third-party complaint, and a reply to an answer when ordered by the court). Further, the Court

need not strike the affidavits and exhibits under Rule 57 as the Court can consider and dispose of any unsupported facts when considering the summary judgment motion. *See Dotson v. Delta Consol. Indus., Inc.,* 251 F.3d 780, 781 (8th Cir.2001) (noting that the Eighth Circuit Court of Appeals has "held many times that a party may not create a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting [the resisting party's] own sworn statements in a deposition"); *Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.,* 114 F.3d 108, 111 (8th Cir.1997) ("[A] district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before. Otherwise, any party could head off a summary judgment motion by supplanting previous depositions *ad hoc* with a new affidavit, and no case would ever be appropriate for summary judgment." (quoting *Wilson v. Westinghouse Elec. Corp.,* 838 F.2d 286, 289 (8th Cir.1988))). Therefore, Defendants' Motion to Strike is denied, but the essential argument in the motion will be addressed through the standards for summary judgment.

### B. Motions for Summary Judgment
### 1. Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party must support its contention by pointing to "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to demonstrate that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c)(1)(A). The evidence must be "viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting Fed.R.Civ.P. 6(c)).

The initial burden falls on the movant to "inform[ ] the district court of the basis for its motion and identify[ ] those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir.1992). However, it is the nonmovant's burden to "produce sufficient evidence to support a verdict in his favor based on more than 'speculation, conjecture, or fantasy.'" *Doe v. Dep't of Veterans Affairs of U.S.,* 519 F.3d 456, 460 (8th Cir.2008) (quoting *Putman v. Unity Health Sys.,* 348 F.3d 732, 734 (8th Cir. 2003)). "A party cannot defeat a summary judgment motion by asserting the mere existence of *some* alleged factual dispute between the parties; the party must assert that there is a *genuine* issue of *material* fact." *Quinn v. St. Louis Cnty.,* 653 F.3d 745, 751 (8th Cir.2011) (internal quotation marks and citations omitted). The fact must be material so that it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The grant of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *In re Baycol Prods. Litig.,* 596 F.3d 884, 888–89 (8th Cir.2010) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "In sum, the evidence must be 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Reed v. City of St. Charles, Mo.,* 561 F.3d 788, 791 (8th Cir.

2009) (quoting *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505).

### 2. Clay's Affidavit [5]

■ "The district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial." *Firemen's Fund Ins. Co. v. Thien,* 8 F.3d 1307, 1310 (8th Cir.1993) (citing *Fin. Timing Publ'ns v. Compugraphic Corp.,* 893 F.2d 936, 942 & n. 6 (8th Cir. 1990); *Geiserman v. MacDonald,* 893 F.2d 787, 792 (5th Cir.1990)).

Generally, a court is required to consider an otherwise admissible affidavit, unless that affidavit contradicts previous deposition testimony. *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 488 (8th Cir.1996). If an additional affidavit simply restates information already contained in deposition testimony or elaborates on information already conveyed, then the district court should consider the affidavit. *Id.* Contradictory supplemental affidavits are a different matter. [The Eighth Circuit Court of Appeals] ha[s] held that "[i]f testimony under oath ... can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment. A party should not be allowed to create issues of credibility by contradicting his own earlier testimony." *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1365 (8th Cir.1983). Post-deposition contradictory affidavits are admitted only when the prior deposition testimony shows confusion, and the subsequent affidavit helps explain the contradiction. *Cuffley v. Mickes,* 208 F.3d 702, 707 (8th Cir.2000).

*Popoalii v. Corr. Med. Servs.,* 512 F.3d 488, 498 (8th Cir.2008) (third and fourth alterations in original); *see also Howard v. Columbia Pub. Sch. Dist.,* 363 F.3d 797, 801 (8th Cir.2004) (noting that a court considers only "admissible evidence and disregard[s] portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact" (citing *Shaver v. Indep. Stave Co.,* 350 F.3d 716, 723 (8th Cir.2003); Fed.R.Civ.P. 56(e))). Thus, the Court must scrutinize the affidavit and see "if it presents a plausible explanation for [the] discrepancies with [the affiant's] prior testimony or other factors justifying an exception to the rule stated in *Camfield* and whether the affidavit generates a material issue of fact precluding ... summary judgment." *Richards v. Farner–Bocken Co.,* 145 F.Supp.2d 978, 1004 (N.D.Iowa 2001) (second alteration in original) (quoting *Hog Slat, Inc. v. Ebert,* 104 F.Supp.2d 1112, 1117–18 (N.D.Iowa 2000)).

In the affidavit, Clay proffers a number of additional incidents previously undisclosed to Defendants. These include, in part, allegations that employees regularly brought guns to the plant and generally ignored instructions from management; that an employee regularly showed up drunk to work; that a coworker taunted Clay with a plastic snake; that Clay was warned to watch his step because mill balls previously had been dropped on people; that an African American coworker on his way home had been followed by a car occupied by white ruffians; that a coworker tried a wrestling move on Clay and

---

**5.** Defendants contest Clay's affidavit in its entirety; however, some content in the affidavit otherwise has been admitted by the parties and is therefore properly before the Court. Further, Defendants admitted at the hearing that materials submitted to the agencies were

provided to them and that the facts contained therein were addressed during the deposition; thus, those facts also have been considered by the Court. Here, the Court deals only with the remaining, disputed content of Clay's affidavit.

another backed Clay out of a conversation; that the word of white employees was accepted by management without question; that a white coworker was allowed to read magazine for days at a time and another coworker was allowed to drive the company pickup around the plant while Clay was not; that a manager listened to the Rush Limbaugh show and the Jim Fisher show; that this same manager complained of his money going to welfare mothers and called the president the anti-Christ; that three rough-looking white men in a boat glared at Clay while Clay was working on a barge; that Clay felt intimidated at work; that coworkers shifted seating in the break room leaving no seat for Clay; that coworkers complained they were going to lose their jobs to women and other minorities; that the company did not give Clay a retirement party;[6] that Schnell said he would lie to cover up his unfair job assignments; that Schnell smirked when putting Clay on a leave of absence; that Clay confronted the union president about the nepotism and discrimination in hiring practices; and that a number of additional racial comments were made. Clay further swears that he was assigned to load a barge in dangerous icy conditions; was assigned to a three week job where he had to jack hammer a spill that had solidified; was consistently assigned to clean up the messes of others when ordinarily workers were responsible for their own messes; was sent to count light bulbs when the cone bottom pumps were running; and that Pennings had threatened to terminate the Lafarge employee who anonymously sent a letter to the management in which the employee complained of Pennings' management style.

 Defendants object to the inclusion of these allegations. Defendants contend that they contradict Clay's statement made in his agency filings that he had experienced only sporadic negative comments and further contradict his deposition testimony in which Clay omitted these occurrences but affirmed that he had disclosed all the statements and incidents supporting his claims against the respective Defendants. In response, Clay generally argues fault lies with Defendants' counsel, as they failed to sufficiently question Clay at the deposition. Further, Clay contends that his affidavit does not contradict his prior testimony but merely provides additional detail. Upon review of the entire record, the Court must disagree. These additional matters allege a further factual basis for Clay's claims in the action, are detailed and substantial in nature, and would have been directly responsive to the inquires made repeatedly during the deposition at which Clay's former counsel was present.

While the Court can and has considered the factual assertions in Clay's affidavit that were already part of the record, *see Popoalii,* 512 F.3d at 498 ("If an additional affidavit simply restates information already contained in deposition testimony or elaborates on information already conveyed, then the district court should consider the affidavit."); *Colosimo v. United States,* 707 F.Supp.2d 926, 939 (S.D.Iowa 2010) ("[The] affidavit is not a sham affidavit, created merely to head off summary judgment. Indeed, the document on which it is based—the Form 4180—predates the motion for summary judgment."), *aff'd,* 630 F.3d 749 (8th Cir.2011), the Court cannot consider this substantial new information that Clay failed to disclose during discov-

---

**6.** Clay further complains that Lafarge failed to give him a gift card that the company had a history of buying for retiring workers. At the hearing, Lafarge admitted that this was its standard practice, that a gift card had been purchased but subsequently lost, and that Lafarge had since then provided Clay a gift card.

ery. Rule 37(a)(4) compels Clay to provide complete, direct, and non-evasive answers at deposition; any failure to do so "must be treated as a failure to disclose, answer, or respond." Clay has not alleged confusion nor has he given any explanation for his omissions and contradictions beyond blaming opposing counsel. This proffered justification cannot suffice on the record of the deposition. To the contrary, Clay affirmatively stated multiple times that he had disclosed all of the alleged statements and incidents upon which he relied for his claims against each defendant; Clay cannot now reinvent the breadth of his claims. Thus, the Court finds the above inadmissible for consideration in the summary judgment record.

Defendants also move to strike two statements from Bob Firrell's affidavit, alleging they are vague and conclusory.[7] Clay provides no argument to contest Defendants' request. Moreover, the Court finds the comments generally unhelpful thus making their exclusion without consequence.

Finally, Defendants move to strike Clay's Exhibits 5 and 6 as they are not authenticated, were not produced during discovery, and are irrelevant for summary judgment purposes. Exhibit 5 is purportedly a picture of Stanley Young; Exhibit 6 is identified as statistics from the Bureau of Labor Statistics for Iowa. Clay counters that the picture of Stanley Young was obtained from Lafarge's employment files and was submitted to the ICRC; Clay does not affirmatively resist Defendants' Motion to Strike Exhibit 6. The Court finds Exhibit 5 is, at best, irrelevant; thus, in light of Clay's failure to resist Defendant's motion with regard to Exhibit 6, the Court finds neither exhibit need be considered. Further, akin to the statements in Firrell's affidavit, the Court finds the exhibits generally unhelpful.

### 3. Lafarge's Motion for Summary Judgment [8]

#### a. Hostile Work Environment

■■■ To meet his prima facie burden, Clay must establish the following:

1) membership in a protected group, 2) the occurrence of unwelcome harassment, 3) a causal nexus between the harassment and h[is] membership in the protected group, 4) the harassment af-

---

**7.** These statements are as follows: (1) "I did the scheduling in the department. I observed that Dave Schnell seemed to load Craig Clay up with night shift assignments"; (2) "There was a lot of racial talk over the years at the plant. It was less frequent during my last 10 years on the job." Firrell Aff. ¶¶ 5, 12, Pl.'s S.J.App. 20–21, ECF No. 38–5.

**8.** "Because [Clay's] Title VII claim and [Clay's] § 1981 claim rely on 'parallel, substantially identical, legal theories of recovery,' [the Court] analyze[s] them in the same way." *E.E.O.C. v. Con–Way Freight, Inc.,* 622 F.3d 933, 936 (8th Cir.2010) (quoting *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1063 (8th Cir. 1997)). Similarly, "[t]he ICRA was modeled after Title VII of the United States Civil Rights Act." *Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999). Thus, courts "turn to federal law for guidance in evaluating the ICRA." *Id;*

*see also Young–Losee v. Graphic Packaging Int'l, Inc.,* 631 F.3d 909, 912 (8th Cir.2011) ("This court analyzes ICRA retaliation claims under the 'same method as federal retaliation claims.' " (quoting *Smith v. Allen Health Sys.,* 302 F.3d 827, 836 (8th Cir.2002))); *Carpenter v. Con–Way Cent. Express, Inc.,* 481 F.3d 611, 616 n. 2 (8th Cir.2007) (considering discrimination claims based on constructive discharge and finding that the court's analysis of the federal claims "applies with equal force to [the plaintiff's] ICRA claims"); *Hannoon v. Fawn Eng'g Corp.,* 324 F.3d 1041, 1046 (8th Cir.2003) (considering a hostile work environment claim and a discrimination claim based on race and national origin and noting that "[b]ecause [the plaintiff] presented no separate arguments under the ICRA, [the court] address[es] his state civil rights claim together with his Title VII claims").

fected a term, condition, or privilege of employment, and 5) the employer knew or should have known of the harassment and failed to take prompt remedial action.

*Meriwether v. Caraustar Packaging Co.,* 326 F.3d 990, 993 (8th Cir.2003) (citation omitted); *see also Gordon v. Shafer Contracting Co., Inc.,* 469 F.3d 1191, 1195 (8th Cir.2006) (noting that the claimant must show the employer knew or should have known of the harassment and failed to take proper action when the alleged harassment was committed by nonsupervisory personnel). Element four requires Clay to demonstrate that "the unwelcome harassment was sufficiently severe or pervasive as to affect a term, condition, or privilege of employment by creating an objectively hostile or abusive environment." *Meriwether,* 326 F.3d at 993 (citing *Bowen v. Mo. Dep't of Soc. Servs.,* 311 F.3d 878, 883 (8th Cir.2002)). "To support a cause of action, 'conduct must be extreme and not merely rude or unpleasant to affect the terms and conditions of employment.'" *Id.* (quoting *Alagna v. Smithville R–II Sch. Dist.,* 324 F.3d 975, 980 (8th Cir.2003)). "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment' ...." *Id.* (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). However, the Court "must evaluate all of the circumstances of a case, rather than merely focus on the initial episode of harassment." *Id.* (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)).

The Supreme Court has explained the difference between discrete discriminatory acts and a series of separate acts that together constitute an unlawful employment practice. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 112–13, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). "A discrete act 'occurred' on the day that it 'happened' and constitutes its own unlawful employment practice." *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.,* 327 F.3d 771, 785 (8th Cir. 2003) (internal quotation marks omitted) (quoting *Morgan,* 536 U.S. at 110, 122 S.Ct. 2061). "[D]iscrete acts include 'termination, failure to promote, denial of transfer, or refusal to hire.'" *Id.* (quoting *Morgan,* 536 U.S. at 114, 122 S.Ct. 2061). However, "hostile work environment claims typically involve[ ] a series of separate acts, which together constitute the unlawful employment practice." *Id.* (citing *Morgan,* 536 U.S. at 116, 122 S.Ct. 2061).

"Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Wilkie v. Dep't of Health & Human Servs.,* 638 F.3d 944, 951 (8th Cir.2011) (quoting *Morgan,* 536 U.S. at 117, 122 S.Ct. 2061). Thus, "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* (quoting *Morgan,* 536 U.S. at 117, 122 S.Ct. 2061). The Court must consider "whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Id.* (quoting *Rowe v. Hussmann Corp.,* 381 F.3d 775, 779 (8th Cir.2004)). "Acts before and after the limitations period that are so *similar in nature, frequency, and severity* must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to the action." *Id.* (alterations omitted) (quoting *Rowe,* 381 F.3d at 781).

As will be explained in more detail *infra,* the expanse of time involved in the allegations, the specific nature of the allegations that may be considered on this record, and the explicit testimony of Clay, all cause the Court to conclude acts outside the limitations period do not constitute part of the same hostile work environment practice. *Id.* Illustrative of the isolated nature of many of the allegations, Clay undermined any continuity when he testified as follows:

Q. Anything else that you attribute, any reasons, why you believe it was based upon your race?

A. Until I made—until I brought these issues up to the company, I had a wonderful relationship with the company. I mean, I went to work every day. No issues with anybody. I didn't feel for my safety or anything.

And it was—I loved the plant. I loved the plant. I loved my job. A

lot of the people I cared about. Because I asked one question, why is this hiring practice so skewed, things just blew up.

Clay Dep. 110:7–17, Def.'s App. D051, ECF No. 32–3; *see also* Clay Dep. 145:18–146:22, Def.'s App. D068–D069, ECF No. 32–3.

Within the period after March 1, 2007, to support his claims, Clay relies upon Schnell's favorable treatment of certain white employees, alleged deficiencies in Lafarge's hiring practices, approximately five discriminatory comments, Drumm's filing of a complaint against Clay, the assignment of one unfavorable job, the assignment to light duty after an on-the-job injury, the shunning by his coworkers, the tool crib incident, and Clay's referral to the EAP and resulting short-term leave.

First, the favorable treatment of two or three white employees,[9] fails to show that

---

9. In Clay's agency materials he alleged the following:

As an ongoing practice since David Schnell, white, became shipping foreman with his creative scheduling, the truck scale operators work overlapping shifts. For example, one man works three a.m. to eleven a.m., and one man works seven a.m. to three p.m. Ninety percent of the time for four hours there are two men doing a one man job, and one man is doing nothing for four hours. When I had down time, Dave always said, "When you finish this job, find me. I have another job for you." I do not object to doing the work, but do object to this not being said to others (white) in the department. When I told Dave I thought this style of managing employees was unfair, and asked why he didn't ask others (white) to do the same as me, he replied, "It's easier to get others to do it than to listen to Less [sic] Drumm (white) complaining." As a result, others (white) were left to do nothing for four hours. It is very rare for Les Drumm to leave his job to help out doing other work in the department. Thus, treatment and expectations for me, a

black man, are different than other men (white) in the department.

Pl.'s App. Resist. Mot. Strike 29, ECF No. 55–2. When asked about these job assignments during his deposition, Clay stated the following:

A. Eugene was in the department, and everybody in the department had jobs they could do. But only certain ones were required, it seemed like. Others were excused, I'll put it that way, from not having to do everything that their jobs—their job description entailed.

Q. All right. Would you explain that a little bit more for me in terms of what people were excused from?

A. There is [sic] certain jobs that certain people wouldn't do.

Q. Such as?

A. Some of them, load a barge. Might have been their job, but they might not have been trained on it. But that's—they were supposed to know those things. And—

Q. Anyone in particular who would not load a barge?

A. Well, I wouldn't say under duress. But there was Bob Firrell, who didn't.

Q. Anyone else?

Clay was made subject to a hostile work environment. This is particularly true when Clay himself admits that these indi-

A. Les Drumm was not, unless he was made to.

Q. Anyone else?

A. That's pretty much that. And, like, different jobs required different things. And like
I said, you had shift workers on the truck scales. And their shifts would overlap. Sometimes because of scheduling—it's a one-man operation—you might have two men in the truck scales. One would come in at 3:00, the other one come in at 7:00. And the one coming at 3:00, go home at 11:00. And you have two men in a one-man job. And they refused to come out and help out, which was not right. So at one time, you would have four men doing a one-man job.

Q. Any other incidents were people would not do particular jobs?

A. Yeah.

Q. Like what?

A. Spills, dirty work. Sometimes you'd have to climb the top of silos to do things. And I mean, some would claim fear of heights. So it's always left to someone else. I mean, my attitude was it was part of my job. I was paid to do a job. I would do it. But people would dictate what they were going to do and what they weren't going to do, and they weren't made to do that job. But—

Q. All right. You mentioned Bob Firrell and Les Drumm in terms of dictating what they would and would not do. Any others who would do that?

A. Most everybody complied. But, you know, they take an act of the foreman to get it done. But your jobs—everybody was trained on each job, because they are supposed to be interchangeable. But it was just under the direction of the department that seniority ruled. And it—and people took that to heart. Certainly things they weren't going to do. So—

Q. And Bob and Les were two of the more senior people?

A. Yeah. That's okay. Because, you know, we—but there were times where it seemed like no one would come down and help us, but we were always—we would shut down operations to go do other things that other people were doing.

viduals had priority in seniority and that Schnell opted not to assign tasks to those individuals to avoid their complaining. To

Q. And us being you and Dennis [Terrill]?

A. Yes.

Clay Dep. 73:15–76:4, Pl.'s App. Resist. Mot. Strike 4–5, ECF No. 55–2.

Q. All right. What are your claims against David Schnell?

A. Unfair treatment.

Q. How so?

A. I mean, what—like I said, everybody in the department is to be qualified, so you can interchange those jobs. And certain individuals were allowed the luxury not to get involved with some of the dirtier work.

Q. And who were those individuals? We have talked about them, right?

A. Yes. Yes. Les Drumm was one.

Q. Les Drumm.

A. He was the major.

Q. Bob Firrell was another one, right?

A. Bob had specific jobs as to things in the office that he was doing.

Q. Okay.

A. It's not so much with Bob. Bob pretty much done his job. But his job dictated for him to be in his office. But when things come up, Bob would come out, and help in the plant. But you can't say the same for Les. Travis was another one that was not made to do too much. I think they were privileged.

Q. Anything—anyone else?

A. Just those two, I'd say.

Q. Everyone else was required to do the same jobs that you were doing, right?

A. Yes.

Q. Have any idea why Les or Travis were not required to do all those jobs?

A. It's easier to have somebody else do it.

Q. Is that because if he asked those two, he would have to listen to them complain for the rest of the time?

A. Yes. And much wouldn't get done.

Q. Any other way in which there was unfair treatment?

A. No.

Clay Dep. 92:13–94:2, Pl.'s App. Resist. Mot. Strike 7, ECF No. 55–2. Thus, while Clay now paints his argument as one of exclusive and continued assignment to tasks, Clay has previously and consistently testified that only a few employees were granted such preferential treatment. Further, Clay often performed tasks with Terrill, a white employee.

assign tasks that fall within a job description to the individual with least seniority is neither severe nor abusive. As the tasks assigned to Clay were also generally assigned to his fellow white coworkers, absent the favored few, Clay fails to show a connection between his race and these assignments. *See Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003) (affirming summary judgment while noting that though the defendant "opposed [the claimant's] hiring, objected to his salary, had his salary lowered, threatened him, and had him arrested, [the claimant] present[ed] no persuasive evidence that [the defendant] took those actions for racially discriminatory reasons"); *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 567 (8th Cir.2000) (finding that though the claimant was ignored by her coworkers and supervisors, isolated from office social activities, shoved against a wall by a coworker who also damaged her car and threatened bodily harm, the claimant failed to tie these activities to her race or gender and failed to report the conduct for over a year, making it difficult to investigate); *Erenberg v. Methodist Hosp.*, 240 F.Supp.2d 1022, 1029 (D.Minn.2003) ("Here, [the claimant] cannot show that the conduct was directed at her because of her sex because she was not singled out on account of her gender; both male and female employees were subject to the same working environment."), *aff'd*, 357 F.3d 787 (8th Cir.2004).

Regarding Lafarge's decision not to employ other African Americans, Clay has alleged with specificity only Lafarge's refusal to hire West.[10] Clay cites no case law to support that the failure to hire an applicant creates a hostile work environment

for existing workers. The rejection of one application—for which Lafarge had reason—neither directly impacted Clay's employment nor indicates racial animus. *See Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1047 (8th Cir.2002) ("In the usual course of events, an employer will hire the most qualified candidate, and an employer, not a federal court, is the best position to 'identify those strengths that constitute the best qualified applicant.'" (alterations omitted) (quoting *Duffy v. Wolle*, 123 F.3d 1026, 1037–38 (8th Cir. 1997). *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir.2011) (en banc))). While Clay may object to Fisher's conclusion that the hiring process was sound, Fisher listened to Clay's complaint, investigated Clay's concerns, and ultimately determined that they were unfounded. This conduct does not demonstrate a hostile or abusive work environment, regardless of Clay's objections to the outcome.

The record does indicate that Clay endured highly offensive and deplorable comments from his coworkers over a period of years. However, each of the above comments were either not reported to management, thereby depriving them of the opportunity to cure the offense, ceased upon Clay's request, or were reported to management and then were acted upon. Lafarge investigated Clay's complaint against Young and Hunt, the former being permitted early retirement but never allowed back in the Davenport plant and the latter receiving a formal write-up but no additional punishment in light of his apology and his use of the term "boy" when speaking to white employees, indicating no racial animus existed. When Clay requested

---

**10.** Clay also notes that two persons—Roe and Anderson—who served on West's hiring committee had previously used racially charged language. These three alleged comments are

not tied to the hiring decisions and fail to indicate that the board's decision was motivated by racial animus.

that his coworkers cease calling him "the other white meat," both complied, and the incidents were never reported to management. In result, none of the offensive and discriminatory statements persisted. Clay otherwise failed to report the statement made by Jason Mangles until July of 2010. Further, courts have routinely held that a few discriminatory comments are insufficient to establish a hostile work environment. *See E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 687 (8th Cir.2012) (finding insufficient for a hostile work environment complaints that the lead driver had poor hygiene, boasted about past sexual exploits, made sporadic remarks of sexual vulgarity, and propositioned for sex on isolated incidents); *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759–60 (8th Cir.2004) (finding racial remarks made once a month for two years were insufficient to render the workplace objectively hostile); *Burkett v. Glickman*, 327 F.3d 658, 662 (8th Cir.2003) ("Offhand comments and isolated incidents of offensive conduct (unless extremely serious) do not constitute a hostile work environment.").

Clay mentions the investigation of Drumm's complaint. While Clay may contend that Drumm's actions were wrongful, Lafarge did nothing more than investigate the claim in compliance with its own procedures and those given Clay's complaints. *See Palesch*, 233 F.3d at 567 ("Not all unpleasant conduct creates a hostile work environment. Rather, the plaintiff must show that [he] was singled out because of h[is] gender [or race], and that the conduct was severe and pervasive." (third alteration in original) (quoting *Williams v. City of Kansas City, Mo.*, 223 F.3d 749, 753 (8th Cir.2000))). Lafarge's actions were consistent with past practices and ultimately resulted in no disciplinary action. Similarly, Clay complains of the incident involving the tool crib; however, even though Clay's access to the crib was unauthorized, no punishment resulted as the access was deemed necessary. *See Carpenter v. Con–Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir.2007) ("To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant." (quoting *Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 846 (8th Cir.2006))). Further, any allegations of stealing were levied against both Clay and Terrill, thereby dispelling any inference that the incident was racially motivated.

Clay also relies on his assignment to light duty as a demonstration of hostile work environment. This assignment, however, was based on both Schnell and Clay's belief that Clay had suffered a sprain—a common injury at the plant. No indication that Clay objected to his assignment to light duty has been presented, and the record reflects that the recommendation was motivated by Schnell's desire to preserve the Davenport Plant's safety streak. While the parties later learned that Clay had broken a bone in his ankle, there was no indication of that belief at the time. Further, an accommodation of an injury fails to support an objectively hostile or abusive work environment.

That Clay was shunned by some of his coworkers is undisputed; however, shunning and other such related conduct has routinely be rejected by courts as sufficiently severe to constitute a hostile work environment. *See, e.g., Ross v. Glickman*, 125 F.3d 859, 1997 WL 603895, at *4 (9th Cir.1997) (table) (per curiam) (shunning by office staff not actionable hostile work environment); *Evance v. Trumann Health Servs., LLC*, No. 3:11CV00025, 2012 WL 2282555, at *5 (E.D.Ark. June 18, 2012) ("Plaintiff's allegations of feeling ostracized and not being a part of the 'clique' are insufficient to establish a hostile work environment."); *McGee v. Omaha Pub.*

*Power Dist.*, No. 8:05CV512, 2007 WL 1434896, at *4 (D.Neb. May 14, 2007) (finding a transfer issue and the belief that coworkers ostracized and would not communicate with the plaintiff insufficient to show a hostile work environment claim); *see also Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 969 (8th Cir.1999) (listing cases that suggest "ostracism by co-workers is not an adverse employment action"). Clay alleges that Lafarge's failure to address the shunning necessitated his medical referral and use of anti-anxiety medication and prevented him from being able to work. However, Clay must establish not only his subjective mind-state, but that his work environment was objectively hostile. *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir.2005) ("For harassment to affect a condition of employment the conduct must be severe 'as it would by a reasonable person and as it was actually viewed subjectively by the victim.'" (quoting *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 840 (8th Cir.1998))). The alleged shunning by his coworkers and a few of his supervisors does not rise to that level.

Finally, Clay invokes the EAP referral; however, Clay himself admits that the EAP referral was proper. Clay had been involved in three serious on-the-job accidents, expressed his experience of stress, and thus was placed on short term leave. In light of Clay's eligibility for termination subsequent to his accidents, this referral is not objectively hostile.

■■ Looking at the circumstances as a whole, Clay complains of the favorable treatment of a few primarily senior employees, Lafarge's refusal to hire one employee it felt unqualified and unlikely to stay, a few discriminatory comments that were addressed when reported, the compulsory investigation of a claim filed by a coworker that resulted in no disciplinary action, the admittedly proper referral to the EAP, the report and investigation of an unapproved access to a tool crib that resulted in no disciplinary procedure based on the necessity of the unauthorized access, the assignment of light duty for a presumed sprain, and the shunning by a few coworkers. While lengthy in number, these allegations fall short of severe or abusive. *See O'Brien v. Dep't of Agric.*, 532 F.3d 805, 810 (8th Cir.2008) (finding that while the appellants "seem to argue that the sheer number of alleged instances of harassment must equate to a racial hostile work environment," the court regards "[t]he frequency of the alleged harassment" as "only one of the relevant factors"); *see also id.* (affirming summary judgment on the hostile work environment claim despite the claimants' supervisor subjecting them to heightened scrutiny; reducing their authority; not allowing one claimant to attend training; not allowing the other claimant to work from home; denying one claimant a performance award; discussing suspending them; attempting to institute disciplinary action against them; and generally interfering with their work on a daily basis by embarrassing, isolating, and ostracizing them, scrutinizing and criticizing their work, and increasing their work load after the claimants engaged in protected activity); *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 788 (8th Cir.2007) (noting that isolated gender-based comments, the denial of an assistant, unfair discipline, lesser pay than male counterparts, refusal to expense pay phone calls, and an assignment to make inventory changes to the computer amounted, at best, to a frustrating work environment rather than an objectively hostile work environment), *abrogated on other grounds by Torgerson*, 643 F.3d 1031; *Carpenter*, 481 F.3d at 618 (finding racial insults and the repeated misloading of the claimant's trailer and the placing of garbage in the claimant's trailer did not

constitute objectively hostile conduct); *Singletary,* 423 F.3d at 892–93 (affirming that job environs where the plaintiff had second-hand knowledge his coworkers and some managers referred to him as a nigger and where his vehicle had been vandalized on multiple occasions were not objectively severe or pervasive); *Bradley v. Widnall,* 232 F.3d 626, 631–32 (8th Cir. 2000) (finding employer's conduct was not so severe or pervasive to have affected a term or condition of employment despite the curtailing of the claimant's supervisory duties, excluding her from the decision making process, being treated with disrespect, and being subjected to false complaints), *abrogated on other grounds by Torgerson,* 643 F.3d 1031.

■ Assuming *arguendo* the statute of limitations did not confine the Court's consideration of facts outside the limitations period and the claims were sufficient in frequency to be considered a continued occurrence, Clay's additional allegations consist of approximately a dozen offensive race-based comments made by nine separate individuals across a decade, the discovery of a dead snake on his car, an unfavorable job assignment, and the denial of medical attention for an injured finger. At an average of approximately one offensive comment per year, the Court cannot find that these comments affected a term of Clay's employment. *See, e.g., Bainbridge,* 378 F.3d at 759–60 (finding racial remarks that were "sporadic, no more than one per month," over a period of two years that were used to refer to customers, competitors and other employees were not "so severe or pervasive [to] alter[ ] the terms or conditions of [the claimant's] employment"). While deplorable in the context of interpersonal relations, the offensive remarks made to or in the presence of Clay do not rise to the level of the extreme work conditions the law requires to dem-

onstrate a hostile work environment. *See Smith v. Fairview Ridges Hosp.,* 625 F.3d 1076, 1083 (8th Cir.2010) ("The stringent hostile work environment standard is designed to 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language ... and occasional teasing.'" (quoting *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275)), *abrogated on other grounds by Torgerson,* 643 F.3d 1031; *Nitsche,* 446 F.3d at 846 ("Allegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was 'so intimidating, offensive, or hostile that it poisoned the work environment.'" (quoting *Tuggle v. Mangan,* 348 F.3d 714, 720 (8th Cir.2003))); *Gipson v. KAS Snacktime Co.,* 171 F.3d 574, 579 (8th Cir.1999). Even were these comments sufficient, Clay failed to report them for over a decade. Thus, Lafarge was never made privy to the occurrence of the majority of the above comments. When Clay finally brought these offensive statements to the attention of management, he provided only quotes and omitted any reference to the time of their stating or the persons involved, thereby hindering any remedial action by Lafarge.

The discovery of the dead snake falls prey to the same faults, as there is no indication that Clay reported the event to Lafarge. Further, a single unfavorable job assignment that Clay does not deny falls within his job description is insufficient to establish a hostile work environment. *See Tuggle,* 348 F.3d at 722 (noting that the "undesirable work assignments admittedly did not affect [the claimant's] advancement opportunities" and that even when combined with the other allegations did not "transform[ ] the work environment, as a whole, into one so extreme as to change the terms and conditions of [the claimant's] employment"); *Gatewood v. Columbia Pub. Sch. Dist.,* 415 F.Supp.2d

983, 1002 (W.D.Mo.2006) ("[The Claimant] was essentially dissatisfied with his work assignments and such dissatisfaction, particularly where the assignments are temporary in nature, cannot form the basis of a hostile work environment claim."); *see also Casiano v. AT & T Corp.*, 213 F.3d 278, 285 (5th Cir.2000) (assigning plaintiff demeaning tasks did not constitute a hostile work environment).

With regard to the injury of Clay's finger, there is no indication in the record that Roe was aware that the finger was broken but simply that it had been injured and was causing Clay significant pain. Clay himself reported Scott's reason for refusing him medical treatment; Scott did not wish to call out an overtime worker to fill Clay's remaining four hours. Scott's solitary instruction to Clay to get his black ass moving and his instruction to work at the back of the kiln—as evidenced by the record, an actual job assignment—is insufficient to support an inference that Scott's denial of immediate medical treatment was racially motivated.

Viewing the totality of Clay's claim, including the sporadic comments, favorable treatment of only two or three fellow employees senior in union ranking to Clay, and assignment of a couple of undesirable tasks that fall within Clay's job description, the Court is required to find that these allegations simply do not meet the high bar of a hostile work environment. The Court's decision is reinforced by Clay's delayed report of many of these incidents, the prompt actions taken by Lafarge in response to those reported, and Clay's own admission that he historically had a great relationship with Lafarge and that his feelings of stress arose only after he first made a report to Fisher in 2010. As Clay cannot meet his prima facie bur-

den, and no genuine issue of fact remains, the Court finds Lafarge entitled to summary judgment on the hostile work environment claim.

### b. Race Discrimination

 A claimant can survive summary judgment on a race discrimination claim "either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination through the *McDonnell Douglas*[11] analysis." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir.2012). "[D]irect evidence in this context is not the converse of circumstantial evidence but is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Id.* (alterations and quotation marks omitted) (quoting *Torgerson*, 643 F.3d at 1044). "Such evidence must be 'strong' and must 'clearly point to the presence of an illegal motive' for the adverse action." *Id.* (alteration omitted) (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir.2004)).

 When relying on an inference of unlawful discrimination, the Court employs the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A claimant must first demonstrate a prima face case of race discrimination by evidencing that "(1) he is a member of a protected class; (2) he was qualified for the position (sometimes articulated as meeting the employer's legitimate expectations); (3) he suffered an adverse employment action; (4) under circumstances permitting an inference that

**11.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

the action was a result of unlawful discrimination." *Anderson v. Durham D & M, L.L.C.,* 606 F.3d 513, 520 (8th Cir. 2010). The fourth element of a prima facie discrimination case is also met if the employee shows that "similarly situated employees outside the protected class were treated differently." *Fields v. Shelter Mut. Ins. Co.,* 520 F.3d 859, 864 (8th Cir.2008) (citing *Carpenter,* 481 F.3d at 616); see also *Turner v. Gonzales,* 421 F.3d 688, 695 (8th Cir.2005). "The burden then shifts to [Lafarge] 'to establish a legitimate, nondiscriminatory reason for taking the allegedly discriminatory action.'" *Anderson,* 606 F.3d at 521 (quoting *Humphries v. Pulaski Cnty. Special Sch. Dist.,* 580 F.3d 688, 692–93 (8th Cir.2009)). When such a reason is put forth, it then becomes the plaintiff's burden to show that the proffered explanation is pretextual. *Id.* The claimant has two avenues to demonstrate pretext: (1) "'indirectly' by showing the proffered explanation 'has no basis in fact,'" or (2) "'directly' persuade the court that a 'prohibited reason more likely motivated the employer.'" *Id.* (quoting *Wallace v. DTG Operations, Inc.,* 442 F.3d 1112, 1120 (8th Cir.2006)).

 Clay does not allege, nor is it apparent from the record, that he is relying on direct evidence of discrimination, thus the Court employs the above burden-shifting test. *See id.* at 520 n. 6. As the first and second elements of Clay's prima facie case are uncontested by the parties, the Court need only consider whether Clay suffered an adverse employment action under circumstances permitting an inference that the action was a result of unlawful discrimination. "An 'adverse employment action' is a 'material employment disadvantage, such as a change in salary, benefits or responsibilities.'" *Ledbetter v. Alltel Corporate Servs., Inc.,* 437 F.3d 717, 724 (8th Cir.2006) (quoting *Sallis v. Univ. of Minn.,* 408 F.3d 470, 476 (8th Cir.2005)); see also *Lisdahl v. Mayo Found.,* 633 F.3d 712, 721 (8th Cir.2011) ("[T]he discrimination provision explicitly limits actionable harm to actions that affect or alter the condition of the workplace ...." (internal quotation marks and citation omitted)). Clay itemizes three bases for his claim that he suffered an adverse employment action: (1) that West and other African Americans were not hired by Lafarge; (2) that Clay was subjected to an ongoing pattern of discriminatory job assignments; and (3) that he endured discrimination and retaliation that led to Clay's referral to the EAP and resulted in loss of pay when on an involuntary leave of absence.

 Beginning with Lafarge's decision not to hire West, Clay has admitted that this hiring decision had no impact on his employment. Clay further concedes that he is not alleging that the refusal to hire West constitutes an adverse action, instead arguing that this event, in conjunction with the pattern of Lafarge's nepotism and exclusive hiring of white employees, could be interpreted as a "racial snub." Resp. 10, ECF No. 38–1. While Clay being one of a small number of minority employees in a plant vastly predominated by white males is relevant, it is not dispositive for Clay's race discrimination claim. *See Wittenburg v. Am. Express Fin. Advisors, Inc.,* 464 F.3d 831, 841 (8th Cir. 2006). That Lafarge may have elected not to hire other African American applicants—an allegation for which Clay has provided no evidence or support beyond Lafarge's rejection of West—does not present an adverse action taken against Clay. Even were the Court to find that such an event could rise to the level of an adverse employment action, Lafarge has provided legitimate, nondiscriminatory reasons for not hiring West, namely that he was over-qualified and likely to leave the plant shortly after being hired. Clay has failed to demonstrate that this expla-

nation is merely pretext; rather, Clay himself argued to management that Lafarge's failure to hire West was based on nepotism, a race-neutral motivating factor.

 While Clay complains of his job assignments,[12] he does not dispute that they fall within his job description and, by Clay's own admission in his deposition testimony, that these tasks were generally required of and performed by other white employees, with the exception of a couple favored employees. *See Duffy v. McPhillips*, 276 F.3d 988, 992 (8th Cir.2002) (noting that the claimant's dissatisfaction with work responsibilities was insufficient to establish an adverse action, for "not everything that makes an employee unhappy is actionable adverse action" as "an adverse employment action must effectuate a material change in the terms or conditions of . . . employment" (citations omitted)). Clay concedes that job assignments were allotted based on seniority and those favored in job assignment were most senior. Thus, here, no material disadvantage resulted; Clay, the lowest in seniority in the union shop, was merely assigned either to a task that he did not want to perform or under conditions that were not ideal. *See Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994) ("Changes in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required to make a prima facie case."). Further, while Clay notes that a few individuals were given preferential treatment, he was not their equal in seniority, and therefore they cannot constitute a similarly situated person. *See Fields*, 520 F.3d at 864 ("The test [for whether a person is similarly situated] is rigorous and requires that the other employees be similarly situated in all relevant aspects before the plaintiff can introduce evidence comparing herself [or himself] to the other employees."). Unfavorable job assignments that prevent an employee from being competitive in his or her position can constitute an adverse action, *see Mawhiney v. Warren Distrib., Inc.*, No. 8:05CV466, 2007 WL 1703331, at *5 (D.Neb. June 11, 2007); however, a plaintiff generally must provide evidence in support of the allegations beyond his or her own perceptions, *see Benford v. City of Minneapolis*, Civil No. 10–04539 ADM/LIB, 2012 WL 6200365, at *21 (D.Minn. Dec. 12, 2012); *contra Woods v. Schutte Lumber Co.*, No. 01–0718–CV–W–HFS, 2003 WL 136187, at *8–9 (W.D.Mo. Jan. 10, 2003) (finding plaintiff's unfavorable work assignments, which included heavier loads, more hand unloads, and more frequent deliveries to bad neighborhoods, constituted an adverse action when plaintiff's allegations were corroborated by three fellow employees and were assigned by a supervisor who used racially derogatory language in reference to plaintiff).

 Even were the Court to find Clay met his prima facie burden, Lafarge provided nondiscriminatory reasons for the

---

**12.** These job assignments include (1) ten to eighteen years ago being assigned to work on top of a silo on the coldest day of the year; (2) being assigned jobs that some of the other white employees refused; and (3) being assigned to clean up a spill with a vacuum on two consecutive nights without help. Notably, the assignment to the silo could not serve as a basis for an adverse action as the event occurred outside the statute of limitations. *See Jackson v. Homechoice, Inc.*, 368 F.3d 997, 999 (8th Cir.2004) (per curiam) (finding a four-year statute of limitations applies to claims filed under 42 U.S.C. § 1981 (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004))); 42 U.S.C. § 2000e–5 (stipulating that a charge must be filed with the EEOC within 300 days after the alleged unlawful employment practice when the claimant institutes proceedings with a state or local agency); Iowa Code Ch. 216, et seq. (stipulating that a charge must be filed within 180 days of the actionable event).

job assignments, as Schnell admitted that he assigned these tasks to his better, more dependable employees in order to avoid dealing with more difficult workers. To show that Lafarge's nondiscriminatory reason is merely pretext, Clay must either demonstrate that the explanation has "no basis in fact" or that a "prohibited reason more likely motivated the employer," *Anderson*, 606 F.3d at 521 (quoting *Wallace*, 442 F.3d at 1120), yet Clay omits any argument demonstrating why Lafarge's proffered explanation is pretext. Further, Clay has failed to connect these assignments with any underlying racial animus. While Clay provides a number of racial comments made to him throughout the years, he fails to connect them to Schnell and Miller, the parties assigning these duties. *See Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1056 (8th Cir.2007) (noting the alleged discriminatory comments made against the plaintiff but concluding that plaintiff "has not connected these comments to [the supervisor's] decisions about his schedule and has not shown that any other decisionmaker at [the company] endorsed them" (internal quotation marks and citation omitted)).

Regarding the EAP referral, Clay concedes that the referral itself does not constitute an adverse action. While being placed on leave could constitute an adverse action, Lafarge had a legitimate, nondiscriminatory reason to impose this measure in light of Clay's three work-site accidents, his admission of experiencing stress, and the recommendation of the EAP psychologist. Clay has failed to show that Lafarge's reason for this imposed leave was pretextual.

Finally, Clay appears to argue that the shunning by his peers, and its emotional toll on Clay, constitutes an adverse employment action. However personally unpleasant, it is well established that the silent treatment, in and of itself, or other such petty slights, are not actionable. *See Recio v. Creighton Univ.*, 521 F.3d 934, 940–41 (8th Cir.2008); *Jones v. Fitzgerald*, 285 F.3d 705, 714 (8th Cir.2002); *Williams*, 223 F.3d at 754; *Scusa*, 181 F.3d at 969–70. Thus, Clay has failed to meet his burden, and, as no genuine issue of fact remains, summary judgment is proper.

### c. Retaliation

"To establish a prima facie case of retaliation, [Clay] must demonstrate (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal connection exists between the two." *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 917 (8th Cir.2007). A plaintiff can defeat summary judgment on a retaliation claim by "produc[ing] either direct evidence of discrimination or [by] creat[ing] an inference of it under the *McDonnell Douglas* burden-shifting framework." *Young–Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir.2011) (citing *Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir.2010)). Here, Clay presents no evidence of direct retaliation, thus the *McDonnell Douglas* test must be employed.

Lafarge does not dispute that Clay engaged in statutorily protected activity; rather, Lafarge contests that Clay suffered any adverse employment action. The burden is on Clay to establish that he endured "retaliation that produce[d] an injury or harm." *Gilbert*, 495 F.3d at 917 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)). "The standard is an objective one, requiring the plaintiff to demonstrate 'a reasonable employee would have found the challenged action materially adverse,' and the employer's action 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting

*Burlington,* 548 U.S. at 68, 126 S.Ct. 2405). "[R]etaliatory actions must be material, producing significant rather than trivial harm." *Id.* (quoting *Devin,* 491 F.3d at 785); *Lisdahl,* 633 F.3d at 721 ("[T]he retaliatory actions prohibited by Title VII are ... not limited to harms that are employment-related—but even actionable retaliation must be materially adverse." (internal quotation marks and citations omitted)); *Littleton v. Pilot Travel Centers, LLC,* 568 F.3d 641, 644 (8th Cir.2009) ("Our post-*Burlington Northern* decisions have consistently held that, to be materially adverse, retaliation cannot be trivial; it must produce some injury or harm." (internal quotation marks and citation omitted)).

Clay avers that retaliation is demonstrated by the unfair jobs he was assigned, the ostracism he encountered, the loss that resulted from his leave of absence, and the emotional decline he endured following his complaint. First, it is axiomatic that to satisfy his prima facie burden, Clay must present adverse conduct post-dating his engagement in a statutorily protected activity. *See Reich v. Hoy Shoe Co.,* 32 F.3d 361, 365 (8th Cir. 1994) ("First, the plaintiff must make a prima facie case by 'showing participation in a protected activity, a subsequent adverse action by the employer, and some evidence of a causal connection between the protected activity ... and the subsequent adverse action.'" (alteration in original) (quoting *Schweiss v. Chrysler Motors Corp.,* 987 F.2d 548, 549 (8th Cir.1993))). As Clay has enumerated no unfair job

assignments made subsequent to his filing of a complaint to management in May of 2012, this argument is without merit.

Regarding the ostracism, Clay concedes that this behavior alone fails to amount to retaliatory conduct. *Sutherland v. Mo. Dep't of Corr.,* 580 F.3d 748, 752 (8th Cir.2009) ("Petty slights and minor annoyances in the workplace, as well as personality conflicts and snubs by co-workers, are not actionable."); *Recio,* 521 F.3d at 940 ("Also, the instances of ostracism that [the claimant] experienced amount to no more than 'nonactionable petty slights' under *Burlington Northern,*" (quoting *Burlington N.,* 548 U.S. at 69, 126 S.Ct. 2405)). As previously discussed, while being placed on a leave of absence could constitute an adverse action, Clay does not claim his referral to the EAP was wrongful, does not dispute that he had three work-related accidents, and admits that he reported stress as the cause of these accidents. Therefore, Lafarge has provided a nondiscriminatory reason for placing Clay on leave, one that Clay has failed to argue pretextual. Finally, Clay's subjective emotional state does not constitute an adverse employment action by Lafarge. As the standard is one of a reasonable worker, and while the circumstances indisputably took a toll on Clay, the shunning endured by Clay cannot be said to be sufficient to deter a reasonable employee from making a claim. In total, even when viewing the facts in a light most favorable to Clay, he has failed to point to a genuine issue of fact warranting the denial of summary judgment.[13]

---

**13.** Clay further relies upon facts not properly raised before this Court, e.g., that Lafarge did not throw him a retirement party, that co-workers shifted seats to prevent Clay from sitting in the break room, and that Clay was intimidated by rough-looking men staring at him. Even were the Court to consider these allegations, the Court would find these additional events insufficient to enable Clay's claim to survive. Notably, Lafarge denies that it provided company-sponsored retirement parties, but, regardless, this alleged failure on Lafarge's part was subsequent to Clay's decision to retire and generally insufficient to constitute an adverse action sufficient to deter a reasonable worker from making a charge of discrimination. Further, that co-workers once shifted seats to prevent Clay

### d. Constructive Discharge

 Finally, Clay relies upon his constructive discharge argument. "Constructive discharge occurs 'when an employer deliberately renders the employee's working conditions intolerable and thus forces [him] to quit [his] job.'" *Jackson v. Ark. Dep't of Educ.*, 272 F.3d 1020, 1026 (8th Cir.2001) (quoting *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir. 1998)). "To be liable, the employer must have intended to force the employee to quit, or at least have reasonably foreseen the employee's resignation as a consequence of the unlawful working conditions it created." *Id.* "Furthermore, the employee must show that a reasonable person, from an objective viewpoint, would find the working conditions intolerable." *Id.* "To be reasonable, an employee must give [his] employer a reasonable opportunity to correct the problem." *Id.* at 1027.

 Upon review of the admissible material before the Court, Clay's claim of constructive discharge cannot survive. Clay relies on a number of race-based statements and taunts occurring across eighteen years, the unfair distribution of work assignments, and the shunning he endured from coworkers to support his claim of constructive discharge.[14] Clay further alleges that the management's toleration of this behavior leads to an inference that the management was similarly biased, as demonstrated by Fisher's alleged siding with Clay's false accuser, Fisher's toleration of coworkers shunning Clay, and Fisher's conclusion that nothing was wrong with the hiring process. Clay concludes that he was forced to retire in order to preserve his own mental health, which deteriorated when subjected to the above discriminatory and retaliatory actions.

In light of the burden imposed on a claimant to support a constructive discharge claim, the facts relied upon by Clay, as presented, are simply insufficient to demonstrate an intolerable work environment. *See Fairview Ridges Hosp.*, 625 F.3d at 1087 ("This is a 'substantial' burden as the 'bar is quite high' in [constructive discharge] cases." (quoting *O'Brien*, 532 F.3d at 810–11)). While Clay relays a number of deplorable comments, they occurred intermittently across nearly two decades of employment. Further, Clay largely hinders his own claim by having failed to report the incidents of harassment, thereby denying Lafarge the opportunity to remedy the situation. Even when reported, Clay omitted the names of

---

from sitting in the break room is insufficient to constitute retaliatory conduct. *See Burlington N.*, 548 U.S. at 68, 126 S.Ct. 2405 ("Title VII ... does not set forth 'a general civility code for the American workplace.'" (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998))); *see also Higgins v. Gonzales*, 481 F.3d 578, 591 (8th Cir.2007) ("[Plaintiff] cannot maker her claim based on personality conflicts, bad manners, or petty slights and snubs."), *abrogated on other grounds by Torgerson*, 643 F.3d 1031. Additionally, the alleged rough-looking men were neither coworkers nor management, but unidentified persons in an unspecified boat on a river and cannot be imputed to Lafarge as an adverse act.

**14.** Clay further relies on additional events not properly before this Court, e.g., that strange rough-looking men glared at him, that a coworker backed him out of a conversation, and that coworkers who historically had used racial slurs carried guns to work and glared at him. As previously discussed, these alleged rough-looking men have no connection to Lafarge and the single coworker backing Clay out of a conversation was never reported to Lafarge; therefore, management had no opportunity to cure the behavior. Further, the alleged presence of guns at the plant was never reported to management, again preventing any remedial action on the part of Lafarge. Thus, the exclusion of these late-raised allegations holds no impact on the survival of Clay's claim.

the offenders and dates of occurrence, further preventing prompt remedial action.

To the contrary of Clay's assertion, there is no evidence Lafarge intended or desired Clay to leave. When Clay timely raised complaints against coworkers—namely, Young and Hunt—Lafarge investigated the offenses and ensured that any discriminatory conduct could no longer occur. Likewise, in conformity with its standard practice and responsibility, when Drumm filed a complaint against Clay, Lafarge had the accusation promptly investigated yet issued no discipline when it was deemed unnecessary. Nothing of record indicates that, when investigating Drumm's claim, Lafarge or Fisher did anything other than follow the same protocol provided to Clay's complaints.

 As previously addressed by the Court, the tasks assigned to Clay were within his job description and similarly assigned to white employees. Further, dissatisfaction with work assignments falls short of establishing constructive discharge. *See Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 496 (8th Cir.1996) ("Dissatisfaction with a work assignment is, as a matter of law, normally not so intolerable as to be a basis for constructive discharge."); *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir.1994) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant work conditions are not so intolerable as to compel a reasonable person to resign."). That Fisher determined the hiring process was sound is inapplicable, as it neither directly impacts Clay nor does it require any inference of bias, as Clay failed to demonstrate that any African American beyond West applied but was not hired. Any instances of shunning, though potentially slow to be remedied, remain insufficient to constitute an adverse employment action or constructive discharge. *See Williams*, 223 F.3d at 754 ("[The coworker's] silent treatment is

at most ostracism, which does not rise to the level of an actionable adverse employment action.").

That Clay endured racially-offensive comments and shunning is undisputed; yet Lafarge generally handled Clay's complaints when raised, sent Clay to the EAP for evaluation when termination was a viable option, allowed Clay short-term leave, asked Clay back when his return was approved, and questioned Clay when he voluntarily submitted his retirement papers. Based on these circumstances, Clay's resignation was neither intended nor sufficiently foreseeable. *See O'Brien,* 532 F.3d at 809–811 (finding the allegations, when "distilled to verbal harassment and increased scrutiny," were insufficient to support a claim of constructive discharge); *Tatum v. Ark. Dep't of Health,* 411 F.3d 955, 960 (8th Cir.2005) (finding that working with unfriendly coworkers and in the same office as her alleged harasser, even after reporting the alleged harassment, did not constitute constructive discharge); *Carpenter,* 481 F.3d at 617 (finding "conduct consist[ing] of unreported racial epithets directed at [the plaintiff] but not heard by [the plaintiff], one racial epithet directed to [the plaintiff] about marrying a black woman, the placement of garbage in his trailer four to twenty times over two years, and the misloading of his trailer up to twenty times over four years" did not constitute a constructive discharge). *Contra Lopez v. Aramark Unif. & Career Apparel, Inc.,* 426 F.Supp.2d 914, 941–42 (N.D.Iowa 2006) (finding a reasonable jury could conclude claimant was constructively discharged where "[t]he conduct complained of by the plaintiffs was pervasive, in that it occurred on almost a daily basis and involved physical sexual touching, leering and rude and offensive comments and jokes made by [the claimant's] supervisor. Furthermore, [the claimant] was shunned, criticized, ostracized and ridiculed at the

hands of coworkers, in addition to being physically assaulted on two occasions"); *Cherry v. Menard, Inc.*, 101 F.Supp.2d 1160, 1188–89 (N.D.Iowa 2000) (finding a genuine issue of material fact remained regarding the plaintiff's constructive discharge claim when the employee had complained of the discriminatory conduct, then endured ostracism while being either ignored or ridiculed by her employer, who made no indication of an intent to respond to, investigate, or ameliorate the harassing behavior). This Court must conclude, therefore, that even when viewing the evidence in the light most favorable to Clay, no genuine issue of fact remains, and summary judgment is proper on this claim.

### 4. Schnell's Motion for Summary Judgment

 Clay's hostile work environment claim brought against Schnell rests upon the work assignments he gave Clay during Clay's last three to four years of employment with Lafarge.[15] Clay argues that, when compared with Schnell's treatment of white workers—whom Schnell allegedly excused from certain work and overstaffed—Schnell's assignment of more and dirtier work to Clay constitutes severe and pervasive harassment that is indicative of racial animus. To the contrary, as previously discussed by the Court, Clay's claim cannot lie on these allegations. When considering a hostile work environment claim, the Court must consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Crutcher–Sanchez v. Cnty. of Dakota*, 687 F.3d 979, 986 (8th Cir.2012) (quoting *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir.2002)). Further, a hostile work environment claim entails both subjective and objective components requiring "an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive." *See Duncan*, 300 F.3d at 934.

---

**15.** Clay further bolsters his claim with alleged incidences not properly before the Court: (1) that Schnell made comments regarding President Obama and welfare mothers; (2) that Schnell assigned Clay to run an industrial vacuum hose two consecutive nights by himself; (3) that Schnell said he would lie about the work assigned Clay when Clay complained of the unfair distribution of labor; (4) that Schnell allowed other employees to violate rules in their truck use; (5) that Schnell allowed another employee to read a magazine for days at a time; (6) that Schnell sent Clay to count light bulbs when the cone pumps were running; and (7) that Schnell asked Clay to clean up other workers' spills. However, even were these claims properly before the Court, they would not provide a genuine issue of fact by which Clay's claim could survive summary judgment. Clay's statement regarding welfare mothers held no explicit or inherent racial connotation and critiquing a political leader similarly lacks the requisite racial animus. Further, in his agency materials, Clay reported that Miller, not Schnell, assigned him to run the hose with only one other worker at the machine's kill switch. Similarly, at his deposition, Clay attributed this assignment as by order of Miller. *See* Clay Dep. 77:12–78:24, Pl.'s App. Resist. Mot. Strike 5, ECF No. 55–2. Clay cannot now contradict his previous testimony and allege anew that it was Schnell who so instructed him. The remaining alleged offensive actions were either infrequent or unspecified, were not directed at Clay, were not inherently racial in nature, or were not particularly severe. *See Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir.2011) (affirming the district court's grant of summary judgment on a hostile work environment claim noting that "[t]he events occurred over the span of more than two years, and 'our cases require that a plaintiff show more than a few occurrences over a course of years.' ... The first three incidents were not directed at [the plaintiff]; the second and third incidents occurred outside of [the plaintiff's] presence; and there is no evidence that the alleged sabotage had a racial character or purpose of it was even sabotage").

As previously established, Clay admits that the preferential treatment was given to only two to three of the more senior union members but that the rest of the workforce was required to perform the same duties. Schnell explained to Clay that his actions were premised on the difficulty that arose when assigning these tasks to these few senior employees. Similarly, the alleged overstaffing appears to involve the same privileged few individuals; regardless, any alleged overstaffing is unlikely to interfere with Clay's work performance, nor is it severe or even necessarily racial in nature. To the contrary, Clay has provided no evidence that Schnell's actions were racially motivated. *See Singletary*, 423 F.3d at 893 (citing the Seventh Circuit Court of Appeals for the proposition that "for conduct to be considered in a race-based hostile work environment claim, the conduct must 'have a racial character or purpose to support a hostile work environment claim.'" (quoting *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir.2004))). Even if this Court could find a causal connection between Clay's race and Schnell's actions, the assignment of jobs to Clay that fall within his job description and are otherwise required of his coworkers falls short of the severe or pervasive requirement. *See Tuggle*, 348 F.3d at 722 (finding no actionable hostile work environment despite the claimant—an electrician—being assigned janitorial, secretarial, and housekeeping jobs as these less desirable tasks had not impacted her advancement opportunities (citing *DeNovellis v. Shalala*, 124 F.3d 298, 311 (1st Cir.1997) (scattered racial comments combined with job assignments below the claimant's qualifications were not severe or pervasive enough to constitute a hostile work environment))); *Gatewood*, 415 F.Supp.2d at 1001–02 (finding an African American hired as a instructional aid could not prove a hostile work environment even though he claimed, in relevant part, that he was forced "all the time" to perform janitorial duties like wash dishes and sweep the floors when there was evidence other Caucasian employees performed similar tasks). Clay himself attests that he generally enjoyed his work environment prior to Lafarge rejecting West's application; thus, Clay's claim is further undermined by his lack of subjective feelings of harassment.

Clay's remaining basis for his claim against Schnell rests on the ankle injury he sustained when under Schnell's supervision. As Clay concedes, both he and Schnell believed the injury to be a sprain—a common injury at the Davenport plant; accordingly, Schnell assigned Clay to light duty in order to maintain the plant's safety streak. Further, the statement of fact that Schnell assigned light duty to others with similar injuries is unchallenged by Clay. As no genuine issue of fact remains, Clay's claim against Schnell cannot survive summary judgment.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motions for Summary Judgment (ECF Nos. 32, 33) must be **granted**. Defendants' Motion to Strike (ECF NO. 50) must be **denied**. The above-entitled action is **dismissed**.

**IT IS SO ORDERED.**